

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-23-00417-CV
_____

IN THE INTEREST OF H.P., A CHILD

On Appeal from the 140th District Court
Lubbock County, Texas
Trial Court No. 2021-544,580, Honorable Douglas H. Freitag, Presiding

March 7, 2024

## MEMORANDUM OPINION

Before QUINN, C.J., and PARKER and DOSS, JJ.

Appellant, S.S. ("Mother"), appeals from the district court's final order terminating her parental rights to her daughter, H.P.[1]  Appellee is the Texas Department of Family and Protective Services.  The Department's case was initially heard before the associate judge in December 2022 and January 2023.  The associate judge signed a proposed order to terminate the parental rights of Mother and Father.[2]  At Mother's request, a de

---

[1] To protect H.P.'s privacy, we will refer to S.S. as "Mother," A.P. as "Father," and H.P. and her siblings by initials.  *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b).  Father's parental rights to H.P. were terminated in the same proceeding before the associate judge but he did not request a de novo hearing or appeal the order of the associate judge.

[2] The associate judge found termination of Mother and Father's parental rights to H.P. was in the child's best interest.  TEX. FAM. CODE ANN. § 161.001(b)(2).  Predicate grounds supporting termination of Mother's parental rights were Family Code section 161.001(b)(1)(D) and (E) (endangering), (M)

novo hearing before the referring district court was conducted in October 2023.[3] Evidence at that hearing included the testimony of witnesses and the record of the final hearing before the associate judge.

Through a single issue, Mother challenges the sufficiency of the evidence supporting the district court's finding that terminating Mother's parental rights was in H.P.'s best interest. We affirm the order of termination.

**Background**

1. Mother and Father's Persistent Drug Use

This is not the parents' first interaction with the Department regarding persistent illegal drug use. During their relationship, Mother and Father have had four children, including H.P. Before H.P. was born, Mother and Father forfeited their parental rights to the other three children after the parents' methamphetamine use caused two children to test positive for the substance at birth. In the present matter, Father testified knowing that exposing the children to methamphetamine would be dangerous to the children, and he discussed it with Mother.

Mother originally attempted drug rehabilitation but admits she "completely failed." Mother admitted she would always be a person who struggles with drug addiction. After

---

(termination-another child); those supporting termination of Father's parental rights were Family Code section 161.001(b)(1)(D),(E),(M),(O) (failed to comply with court order for return of child).

[3] Mother appealed the referring district court's order denying her request for a de novo hearing. We reversed and remanded the case for further proceedings. *See In re H.P.,* No. 07-23-00105-CV, 2023 Tex. App. LEXIS 5147 (Tex. App.—Amarillo July 6, 2023, no pet.) (mem. op.). Earlier, Mother's request for de novo review by the referring district court of the associate judge's report was mistakenly transmitted to this Court. We dismissed that case for want of jurisdiction. *In re H.P.,* No. 07-23-00018-CV, 2023 Tex. App. LEXIS 1031 (Tex. App.—Amarillo Feb. 16, 2023, no pet.) (per curiam, mem. op.).

H.P.'s removal, Mother's drug abuse continued. She admits she used methamphetamine through March 18, 2022. She said she did not initially perform court-ordered services necessary for reconciliation with H.P. because she was "in [her] addiction." She acknowledged missing eight court-ordered drug tests from June 2021 through February 2022, again attributing it to being "in [her] addiction." Mother also attributed not visiting H.P. many times to being "in [her] addiction." She used the phrase eleven times to explain behaviors that were contrary to her child's interests.

Mother completed drug rehabilitation in May 2022, seven months before the hearing before the associate judge. She testified she has not used illegal substances since that time. She conceded that drugs have been more important to her than her children but says that was "in the past." Mother attends Alcoholics Anonymous/Narcotics Anonymous meetings, has a sponsor, a support system, and works "a lot." Nevertheless, testimony from Margie Lopez, Mother's caseworker since October 2022, shows that on three occasions, Mother delayed for a few days before appearing for ordered drug tests. Lopez said it is important for parents to appear for tests on their ordered days to ensure they do not consume other substances "that would clear out their system."[4]

2. Physical Health Effects

While pregnant with H.P., Mother and Father used methamphetamine on a daily basis. Mother admitted she was "actively high" when H.P. was born in May 2021. H.P. and Mother tested positive for methamphetamine in the hospital, so the Department

---

[4] Richard Gatlin, a licensed professional counselor who treated Mother during her rehabilitation, acknowledged that this delay would be concerning.

removed H.P. from her parents' custody and placed her in foster care. The Department began its case against Mother and Father in early June 2021.

According to the testimony of H.P.'s pediatrician, Michal Pankratz, M.D., H.P. was referred to a neurologist during her first year because of the child's small head circumference. No specific cause was identified except for H.P.'s prenatal exposure to methamphetamine. Dr. Pankratz also testified it was not unusual to see children with prenatal exposure to methamphetamine have mental health challenges such as ADHD later in life. Dr. Pankratz also attributed a milk protein allergy to H.P.'s early exposure to methamphetamine. Mother agreed her use of methamphetamine during pregnancy could cause abnormalities in the child.

3. Mental Health Effects

During pendency of this case, Mother and H.P. have spent some time together in supervised visitation. These visits began in Mother's home and were moved to a neutral location. The director of the daycare facility caring for H.P. testified that on days after visits with Mother, the child's "whole demeanor is just different. She is just unsettled." The child cries and wants to be held by caretakers much of the day, which the witness described as "excessive for a child [H.P.'s] age." The week of trial, H.P. experienced the "worst night terror" the director had ever witnessed. There is also some evidence indicating a disagreement regarding the foods that Mother should give H.P. because of the child's milk allergy; Mother, however, denied countermanding the caseworker's instructions.

### 4. Other Environmental Factors

Mother has admitted having a co-dependent, drug-consumed relationship with Father but said she would maintain independence. During trial, she announced a requirement that Father would not be allowed in the home until after completing rehab. Despite these statements, the evidence showed that after Father was released from jail in May 2023, he re-commenced living with Mother. He has not enrolled in any rehabilitation program. Father's explanation for this choice is simply, "I don't think it's for me." Mother plans to "co-parent" with Father.

Mother's plan for H.P. is "to bring her home so I can teach her to . . . grow up to be a healthy, loving person who knows and understands God. That's . . . my dream." She added that she planned for H.P. to complete high school and go on to college. Father testified that because he and Mother could not afford daycare, he planned to quit his job and care for H.P. at home but would remain employed if an affordable daycare program became available.

H.P.'s caseworker found no physical dangers in Mother's home. However, she testified the home was not prepared for H.P.'s entry because it lacked tangible items for the child such as furniture and a bathtub.

Mother began counseling with Richard Gatlin in September 2022, whom she saw twice a month and planned to continue seeing after the case closed. The counselor recommended allowing Mother some unsupervised visits with H.P., but the testifying caseworker expressed concern, in part because of Mother's reluctance to allow caseworkers into her home.

Mother testified that she had a personal vehicle for attending work. At final hearing, Mother testified she performed janitorial services with ABM Janitorial at the Texas Tech School of Medicine for $11 per hour. Her employer described Mother as "a very good employee," and added Mother had been recognized as the company's employee of the month and had received favorable comments from the client.

### 5. H.P.'s Relationship with Foster Parents

The caseworker testified about her observations of H.P.'s relationship with her foster parents:

> I see stability. I see a lot of love. A lot of care. [H.P.] seems very, very happy. She seems attached to them, to her foster brother in the home as well. She seems very attached to him, and she definitely enjoys being there.

The caseworker saw no reason why H.P.'s placement would not become long-term with adoption if parental rights were terminated. H.P.'s daycare witness added that the child was currently "thriving, doing unbelievably well."

**Analysis**

Mother does not contest the evidence supporting the predicate grounds for terminating her parental rights. Rather, we construe Mother's single issue on appeal as challenging the sufficiency of the evidence supporting the district court's finding that termination of Mother's parental rights was in the best interest of the child.[5]

---

[5] "The proper standard of review in a termination of parental rights case is sufficiency of the evidence based on a burden of proof by clear and convincing evidence, not abuse of discretion." *Rodriguez v. Blessed Trinity Adoptions,* No. 01-96-01021-CV, 1998 Tex. App. LEXIS 2019, at *17 (Tex. App.—Houston [1st Dist.] Apr. 2, 1998, no pet.) (not designated for publication); *In re A.C.,* No. 07-21-00306-CV, 2022 Tex. App. LEXIS 1801, at *5 n.4 (Tex. App.—Amarillo Mar. 16, 2022, no pet.) (mem. op.).

The Due Process Clause of the United States Constitution and section 161.001 of the Texas Family Code require application of a heightened standard of clear and convincing evidence in cases involving involuntary termination of parental rights. *In re E.N.C.,* 384 S.W.3d 796, 802 (Tex. 2012); *In re J.F.C.,* 96 S.W.3d 256, 263 (Tex. 2002). The applicable standards for reviewing the evidence are discussed in our opinion in *In re A.M.,* No. 07-21-00052-CV, 2021 Tex. App. LEXIS 5447 (Tex. App.—Amarillo July 8, 2021, pet. denied) (mem. op.). As factfinder, the district court was the exclusive judge of the credibility of the witnesses and the weight given their testimony. *In re H.E.B.,* No. 07-17-00351-CV, 2018 Tex. App. LEXIS 885, at *5 (Tex. App.—Amarillo Jan. 31, 2018, pet. denied) (mem. op.). To assess the trial court's best-interest determination, we may consider the factors announced in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex.1976).

The evidence in this case is sufficient to support the district court's finding that termination of parental rights is in the best interest of H.P. As indicated above, the evidence shows that Mother and Father have previously lost parental rights to three older children due to illegal drug use. Despite Mother's stated commitment to sobriety, her drug use continued through her pregnancy with H.P. Evidence shows the adverse effects to the child.

Moreover, evidence regarding Mother's commitment to keep the child away from drugs (which she acknowledges is harmful to H.P.) is conflicting at best. Despite stating a requirement that Father would be required to successfully complete drug rehabilitation before moving back into the home, Mother has allowed Father to return home in the face of his position that rehab is not for him. This is particularly relevant given Mother's intention to "co-parent" with Father and the potential plan for Father to primarily care for

7

the child while Mother works. This evidence is more than sufficient for the district court to believe that permitting H.P. to return to Mother risks re-exposing the child to a harmful environment.

Evidence also suggests that H.P. struggles with adjustment after spending time with Mother. Although she is unable to express her desires, the evidence indicates that following supervised visitation, H.P.'s "whole demeanor is just different. She is just unsettled." She cries and wants to be held by caretakers more than others her age.

Conversely, evidence regarding the child's 18-month placement with foster parents suggests the child is doing well with them and her foster brother. Likewise, the director of H.P.'s childcare center observed that H.P. is "thriving, doing unbelievably well" in her current placement.

No doubt, there is evidence that Mother has made commendable effort in some areas of her life to improve her circumstances. Our role, however, is to review the trial court's order in light of all the evidence. We conclude that legally and factually sufficient evidence supports the district court's determination that terminating Mother's parental rights is in H.P.'s best interest. Mother's best-interest challenge is therefore overruled.

## Conclusion

We affirm the final order of the district court.


Lawrence M. Doss
Justice


8